IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 19 CR 916 |
| ) | |
| OTHO HARRIS, ) | Judge John J. Tharp, Jr. |
| ) | |
| Defendant. ) | |

**ORDER**

Defendant's motion to suppress evidence and quash arrest [68] and motion to dismiss the case for failure to provide exculpatory evidence [79] are denied. Defendant's motion to bar photo array identification [79] is granted in part and denied in part. See Statement for details.

**STATEMENT**

**I. Background**.

Defendant Otho Harris is charged with one count of arson in violation of 18 U.S.C. § 844(i). On September 10, 2019, at about 4:30 a.m., an individual broke a hole in the glass front door of a Boost Mobile retail store in a strip mall at the southeast corner of South Cottage Grove Avenue and East 79th Street, poured a flammable liquid into the store, and set it ablaze. A few hours earlier, at about 7:00 p.m. the prior evening, Mr. Harris had been in the store complaining that his phone was not working; the store manager told him that the phone had water damage. Upset by what he considered to be a disrespectful response, Mr. Harris forcefully threw the phone down on the floor of the store, "completely destroying" the phone. Motion to Suppress, ECF No. 68, at 6. During this episode, which was videorecorded, Mr. Harris was wearing an unbuttoned light blue work shirt with patches on either side of the chest for the company name and the employee name, a white undershirt, darker blue work pants, work boots, and a black baseball cap with a gold field above the bill of the cap on which a stylized version of the word "Chicago" was printed in black and a sticker on the bill.

The arson was videorecorded as well, by cameras inside and outside the store.[1] Those recordings show an individual walk back and forth in front of the store several times a few minutes

---

[1] The video footage that shows the face and clothing of the arsonist is footage from cameras at Happy Liquor and Food store, located just to the west of Boost Mobile (channels 3 and 4). The video from inside the Boost Mobile store shows the acts of the arson (pouring gas into the store and igniting it) but is not clear enough to see the face or clothing of the arsonist. The Boost Mobile

before the arson, occasionally walking out of sight around the corner of an alley. At first siting, the individual who ultimately starts the fire at Boost Mobile can be seen walking along the sidewalk in front of the store from west to east. (Happy Liquor video CH04 at 03:08:36; CH03 at 03:08:49.) As he walks east, toward Boost Mobile, his face is not visible, but he is wearing a white t-shirt, dark work pants, and a black baseball cap that has a gold field with stylized black lettering above the bill and a sticker on the bill. The soon-to-be-arsonist proceeds past the Boost Mobile store and turns right into an alley just beyond the store.

The arsonist reappears from the alley about 13 minutes later, walking from east to west in front of the store and facing the Happy Liquor video camera. The individual was dressed in the same attire Mr. Harris was wearing when he was in the Boost Mobile store the prior evening: unbuttoned light blue work shirt with chest patches, dark blue pants, work boots, and a black ball cap with a gold field above the bill and stylized black lettering; a sticker on the bill can be seen at various points. Glare from lights reflecting off the gold field obscures the lettering on the hat, however, so it cannot be determined whether it says "Chicago." The individual is an African American male and, as he passes by the camera, his face can be seen clearly: he closely resembles Mr. Harris.

A few minutes later, the same individual can be seen walking past the store again, only this time wearing a pair of dark coveralls. The white t-shirt is still visible, however, and more significantly, the man is wearing the same black ball cap with a gold background above, and a sticker on, the bill. After passing by the camera while walking east to west, the figure returns to view a few seconds later, now walking west to east. Just after coming back into view, the individual turns and looks back in the direction of the camera providing another clear view of his face: again, the individual looks like Mr. Harris.

The individual continues walking past Boost Mobile and disappears into the alley east of the store. He reemerges about 5 minutes later, stopping in front of the Boost Mobile store. At about 4:30 a.m., he threw an object at the front door of the Boost Mobile store, breaking the glass. He then quickly retrieved a white container from around the corner in the alley, returned to the store, and poured liquid from that container into the store. The arsonist then took the white container back to the alley and returned moments later to the store. At that point, he lit something on fire and tossed it into the store through the broken window. The liquid erupted into flames and the arsonist ran back to the alley, disappearing around the corner. About 15 seconds later, a car pulled out of the alley and headed west on 79th Street. A white bleach container, two lighters, and a glove were recovered at the scene.

About two weeks after the fire, the store manager who interacted with Mr. Harris on September 9 identified Harris in a photo array. The employee picked Harris's photo out of the lineup and stated: "That's the guy that burned the store for no reason." The record does not reflect the basis by which the manager was able to identify Mr. Harris as the arsonist (as opposed to

---

cameras appear to report the accurate time (based on the time at which the fire was reported); the time stamp on the Happy Liquor video appears to be almost an hour earlier than the Boost Mobile video time stamp.

identifying Mr. Harris as the disgruntled customer from the prior evening who had slammed his phone against the floor).

A week later, Chicago police arrested Mr. Harris at about 5:10 a.m. as he was driving to work in his mother-in-law's car, a green Dodge Neon. They transported Mr. Harris to a police station where he was questioned by a Chicago police detective for about an hour and a half. Mr. Harris was not handcuffed or otherwise restrained during the interview. The interview was videorecorded. At the outset of the interview, Mr. Harris was advised of his *Miranda* rights, acknowledged that he understood them, and waived them. During this interview Mr. Harris was shown video of the arsonist walking back and forth on the sidewalk in front of the Boost Mobile store shortly before the fire; he steadfastly denied that he was the individual in the video, though he conceded "that's someone who looks like me." (CPD Interview at 07:14:13). After the interview concluded Mr. Harris remained in the interview room for several hours and was taken to the police station lockup, where an intake process was completed. Mr. Harris was photographed and fingerprinted, and when questioned as to whether he had any serious medical problems, he indicated that he did not.

Nevertheless, Mr. Harris was transported to a hospital at about 5:30 p.m. The hospital records reflect that on arrival, Mr. Harris complained that he needed blood pressure medication and medications for hip pain. The examiner's notes comments indicate that Mr. Harris is a "60 Y.O. male with hx (history) of htn (hypertension) who is under arrest brought by CPD for medical clearance/htn meds. PT (patient) did not take htn meds today. He denies symptoms: Denies chest pain/sob (shortness of breath), denies ab (abdominal) pain/vomit/diarrhea. Denies headache. Denies urinary symptoms, denies blurred vision." The examination notes also reflect that Mr. Harris was "alert" and "answered questions appropriately" and was not in distress. Mr. Harris was administered one dose of a hypertension medication and was discharged to police custody in "good condition" at about 8:30 p.m.

Two ATF agents arrived at the hospital shortly before Mr. Harris was discharged. Learning that he was about to be discharged, they introduced themselves to Mr. Harris and went to the police station to interview him. This interview, which took place in the same room that the CPD interview had been conducted in, was also videorecorded. Mr. Harris was again advised of his rights and waived them in writing, signing an "Advice of Rights and Waiver" form at the outset of the interview. Mr. Harris made no complaints about pain in his hip during the interview. He acknowledged that he had gone into the Boost Mobile store on September 9 attempting to get money back for his broken phone and that he had slammed the phone down and left the store after the manager refused to refund any money. Mr. Harris repeatedly denied that he was the arsonist, however, insisting that he was not the individual shown in the video walking in front of the store and starting the fire. Nevertheless, Mr. Harris again acknowledged the close resemblance of the arsonist on the video and himself; when one of the agents said, "it looks like you," Harris agreed: "yeah, it does." (ATF Interview at 21:28:28).

After advising Mr. Harris that a number of items of physical evidence had been recovered from the scene of the fire, the ATF agents asked Mr. Harris if he would be willing to provide a DNA sample to see if any of his DNA was on any of those items. Mr. Harris responded immediately, stating: "Yeah, I can do that." Harris then signed a "Consent to Search" form after it was read to him by one of the agents and cooperated in the swabbing of his mouth. Mr. Harris

refused the agent, however, when he asked a few minutes later whether Harris would agree to take a polygraph examination.[2]

While Mr. Harris was being interviewed by the ATF agents at the police station, other law enforcement officers interviewed Mr. Harris's wife at their residence. Harris's wife invited the officers into the house and agreed to be interviewed; this interview was audio-recorded. During the interview, Ms. Harris agreed to allow the agents to search the car she had been observed driving, which she identified as her mother's car. Agents searched the car but did not seize anything from it. In the residence, however, they did observe and seize a black baseball cap with a gold background above the bill that had "Chicago" printed in stylized black lettering—just like the cap that Mr. Harris was wearing when he went to the Boost Mobile store with his broken phone and the hat that the arsonist was wearing when he started the fire.

Mr. Harris, who is proceeding *pro se*, has filed three motions. His first motion[3] seeks to suppress several items of evidence gathered during the investigation, specifically: the DNA evidence obtained from him during the ATF interview on September 30; the black baseball cap seized from Mr. Harris's residence during the interview with the defendant's wife; and any evidence recovered from an automobile at the residence that belonged to his mother-in-law. His second motion seeks to suppress an out-of-court identification of Mr. Harris by an employee of the Boost Mobile store. And third, he asks the Court to dismiss the case as a sanction for the Government's alleged failure to produce *Brady* evidence.

II. Discussion

*A. Motion to Suppress Out-of-Court Identification as Arsonist*

The identification by the store manager of Mr. Harris in the photo array is potentially relevant to the question of probable cause presented by Mr. Harris's motion to suppress evidence, so the Court addresses it first. To begin, the gist of Mr. Harris's motion is that the store manager's identification of Harris as the arsonist could only rest on his observation of the videorecording of the arson because he was not a witness to the crime. As Mr. Harris points out, the only opportunity that the manager had to observe Harris in person was during Harris's visit to the store the prior evening when he demanded a refund and slammed the phone on the floor when the manager refused Mr. Harris's demand. That is true enough, but it does not necessarily render the identification inadmissible. An identification witness does not have to be an eyewitness to a crime to offer lay opinion testimony as to the identity of someone depicted in a photograph or videorecording. *See, e.g., United States v. White,* 639 F.3d 331 (7th Cir. 2011) (allowing non-eyewitness identification testimony based on video recording in case where defendant claimed that

---

[2] The government reports that DNA testing subsequently confirmed that Mr. Harris's DNA was found on the white bleach container, the container's cap, and the interior and exterior of the glove. This is the evidence Mr. Harris seeks to exclude through his motion to suppress.

[3] Mr. Harris filed his first motion on August 18, 2021. ECF No. 68. At the time, he was represented by counsel and the Court declined to consider his pro se submission. ECF No. 69. Ultimately, Mr. Harris waived his right to counsel and elected to proceed *pro* se. At that point, the Court set a briefing schedule. ECF No. 77.

the video depicted someone else). There is, moreover, no need to assess the reliability of the manager's identification of Mr. Harris as "the guy who burned the store for no reason," because the government has committed that it "will not seek to introduce at trial the store employee's statement during the photo array." Resp., ECF No. 84, at 17.

The only purpose, then, that testimony about the store manager's photo array identification of Mr. Harris can serve is as evidence that the manager identified Mr. Harris as the disgruntled customer who, just hours before the arson, slammed his phone down on the floor when told the store would not refund his money. But Mr. Harris does not challenge the reliability of ***that*** identification; to the contrary, he acknowledges the accuracy of that identification by admitting that the refusal to grant a refund "upsetted [sic] Mr. O. L. Harris to the point of completely destroying his phone by slamming it to the floor." Mtn., ECF No. 68, at 6.

Based on the government's agreement that it will not seek to introduce the manager's statement identifying Mr. Harris as the arsonist and Mr. Harris's failure to dispute the reliability of the identification of Mr. Harris as the disgruntled customer he encountered on the evening before the arson, the motion to suppress evidence of the manager's photo array identification of Mr. Harris is granted in part and denied in part.[4] The manager's statement identifying Mr. Harris as the "guy who burned the store" cannot be offered. The identification may, however, be offered as evidence that Mr. Harris was the disgruntled customer who slammed his phone onto the floor when the manager refused to refund a payment.

### B. Motion to Suppress Evidence Seized on September 30

#### 1. DNA Evidence

Mr. Harris seeks to suppress the DNA evidence collected from him during the interview with the ATF agents. He acknowledges that he signed a consent form allowing the agents to collect this evidence but maintains that it should be suppressed as fruit of the poisonous tree because police lacked probable cause to arrest him.[5] He also maintains that his consent was coerced rather

---

[4] Also, the government is correct that Mr. Harris's motion sets forth no argument that the photo array was unduly suggestive and fails for that reason as well.

[5] Mr. Harris also appears to argue that his arrest was unlawful because police had not obtained a warrant. Warrantless arrests do not violate the Fourth Amendment, however, when they are supported by probable cause and are made in a public setting. *Gerstein v. Pugh*, 420 U.S. 103, 113 (1975) (rejecting a warrant requirement for all arrests as "an intolerable handicap for legitimate law enforcement"). Mr. Harris does acknowledge that police may detain suspects without a warrant to investigate where circumstances provide reasonable suspicion that a crime has been committed, but in invoking the *Terry* stop doctrine, Mr. Harris is selling himself short. The detention permitted by the investigatory detention doctrine is brief and narrow in scope. The nineteen-hour detention of Mr. Harris on September 30 was not a *Terry* stop; it was an arrest (and the government does not contend otherwise). As such, its lawfulness turns on the more demanding standard of probable cause rather than the lower "reasonable suspicion" standard that applies to investigative detentions.

5

than voluntary because he was questioned in an extremely cold interview room where the temperature exacerbated the hip pain caused by a steel rod surgically implanted in his leg.

Mr. Harris's claim that police lacked probable cause to arrest him grossly discounts the information known to police when the arrested him. Mr. Harris argues that the only information police had to link him to the arson when they arrested him was his angry encounter with the store manager the evening before the arson. See Mtn., ECF No. 68, at 7 (only evidence available to officers "was that he was upset after paying his phone bill of ($65.00), and his phone immediately shut down, and would not work, [and] that Mr. O. L. Harris gave his phone number to [the manager]"). But that is simply wrong. The arresting officers not only knew that Mr. Harris had stormed out of the store just hours before the arson; they also had viewed video recordings from cameras inside the store and on the outside of a neighboring store that gave them ample cause to believe that Mr. Harris set fire to the Boost Mobile store just a few hours after he had stormed out of the store in anger.

When they arrested Mr. Harris on the morning of September 30, 2019, police knew at least the following:[6]

- An arson had been committed at the Boost Mobile store;
- Mr. Harris was a customer of that Boost Mobile store;
- Mr. Harris had a motive for damaging the store;
- Mr. Harris had a heated dispute with the store manager only about nine hours before the arson, during which he slammed his phone into the ground, destroying it;
- During his dispute with the store manager, Mr. Harris was wearing a light blue long-sleeved work shirt with light colored chest patches, a white undershirt, dark blue work pants, work boots, and a black baseball cap with "CHICAGO" printed on the front in black lettering on a field of shiny gold material and that, until he put on a pair of coveralls, the arsonist was wearing what appears to be precisely the same attire;
- The arsonist and Mr. Harris shared a penchant for wearing their shirts unbuttoned; and
- The arsonist, who can be seen clearly in the video taken by a camera at Happy Liquor, was an older African American male who closely resembled Mr. Harris (again, even Mr. Harris acknowledged that the arsonist looked like him).

This information easily sufficed to provide probable cause to believe that Mr. Harris was the arsonist. "When facts support a 'fair probability' that a suspect has committed a crime, probable cause to arrest exists." *Bridewell v. Eberle*, 730 F.3d 672, 675 (7th Cir. 2013) (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). In *Gates,* the Supreme Court described the question of probable

---

[6] It appears from questioning during the CPD and ATF interviews that police had video of a green Neon sedan like the one owned by Mr. Harris's mother-in-law, and which he regularly drove to work, passing by and/or parked near the Boost Mobile store just before the arson. The government has not provided that evidence, however, so the Court cannot consider it in evaluating probable cause to arrest Mr. Harris.

cause as a "commonsense, practical" inquiry, 462 U.S. at 230, as to whether the circumstances "warrant suspicion" justifying detention. *Id.* at 235. The coincidence of the timing of the arson—just hours after Harris stormed out of the store feeling disrespected—committed by someone who bore a close resemblance to Mr. Harris and was also wearing the same clothing Harris had been wearing during his argument in the store, including a distinctive hat—provided ample reason to believe that Mr. Harris had committed the arson and justified his arrest for questioning.

The evidence catalogued above does not, to be sure, resolve all doubt or preclude the possibility that someone other than Mr. Harris started the fire at Boost Mobile. In that regard, Mr. Harris points out that the store owner told the fire marshal that approximately a week prior to the fire, storm activity had knocked out Boost Mobile's systems for about four hours, upsetting many customers and that one had said "we should burn down the store." But the possibility that some other disgruntled customer had a motive to burn down the store does not negate the evidence that points to Mr. Harris as the arsonist. Police are not required to complete a robust investigation before concluding that there is probable cause to arrest a suspect. *Dollard v. Whisenand*, 946 F.3d 342, 355 (7th Cir. 2019) "On the one hand, an officer may not ignore conclusively established evidence of the existence of an affirmative defense, but the Fourth Amendment imposes no duty to investigate whether a defense is valid." (cleaned up); *Askew v. City of Chi.*, 440 F.3d 894, 895 (7th Cir. 2006) ("Police need not conduct an investigation but may arrest and let prosecutors and courts determine who is telling the truth.").

Because police had probable cause to arrest Mr. Harris, his argument that the DNA evidence collected during his post-arrest interview should be suppressed as the fruit of an unlawful arrest plainly fails. Mr. Harris offers an alternative ground for excluding the DNA evidence, however, arguing that the consent he gave for the collection of his DNA was not voluntary but coerced by the agents. He maintains that the officers kept him in an extremely cold interrogation room for 19 hours, which caused him intense pain because a surgical rod implanted in his leg was sensitive to temperature and caused severe hip pain in cold environments.

This argument should be a non-starter: the Supreme Court has held that taking a buccal swab from a defendant who has been lawfully arrested based on probable cause does not violate the Fourth Amendment. *See Maryland v. King*, 569 U.S. 435, 465 (2013) ("In light of the context of a valid arrest supported by probable cause respondent's expectations of privacy were not offended by the minor intrusion of a brief swab of his cheeks."); *United States v. Schreiber,* 866 F.3d 776, 779-80 (7th Cir 2017) (rejecting challenge to warrantless buccal swab). The government, however, does not argue that obtaining Mr. Harris's DNA by means of the buccal swab was not a search under the Fourth Amendment, and does not cite *Maryland v. King*, so it has forfeited the argument that Mr. Harris's consent to DNA collection by buccal swab was not required. As the government has instead addressed Mr. Harris's lack-of-consent argument, so must the Court.

No matter. It is undisputed that Mr. Harris signed a consent to search form which authorized the agents to perform a DNA swab of his mouth. Govt. Response, ECF No. 84, Ex. C. Mr. Harris does not deny that he signed the consent form, but maintains that he did not do so voluntarily but was coerced by law enforcement to sign the consent form by subjecting him to "an extremely cold interrogation room [where] he was interrogated for approximately nineteen (19) hours." Motion to Suppress, ECF No. 68, at 1. Mr. Harris has a surgically implanted rod in his right leg that causes "severe pain in [his] hip when exposed to cold weather for a long period of

time." *Id.* at Affidavit ¶ 4. The combination of the cold interrogation room and 19-hour interrogation, he claims, made his pain "so unbearable to the point that [he] gave in under duress to consent to the taking of [his] DNA." Motion to Suppress, Affidavit ¶ 8, ECF No. 68

This claim cannot be squared with the video evidence of the interview, which plainly shows that Mr. Harris consented to the buccal swab DNA collection voluntarily and without coercion. The video shows that Mr. Harris readily agreed to allow the swab as soon as it was proposed and after only about 25 minutes of questioning, at which point he had not complained of cold or pain and was not visibly in any sort of distress. Simply put, the interview video shows Mr. Harris's claim that he succumbed to unbearable pain in signing the consent forms for the buccal swab to be fiction.

What the video does support is Mr. Harris's assertion that throughout the entire day, "he denied any an[d] all participation in [the arson]." Motion to Suppress DNA at 1. It is true that Mr. Harris consistently denied that he set the Boost Mobile store on fire but his persistence in maintaining his innocence undermines rather than buttresses his claim that his consent to the DNA swab was involuntary; Mr. Harris offers no explanation as to why the unbearable pain he purportedly experienced was sufficient to force him to consent to a DNA search but was insufficient to force him to admit his guilt. The explanation can be found, however, in Mr. Harris's dogged insistence (despite agreeing that the arsonist "looks like me," that he is not the man seen on the video who starts the fire. Mr. Harris's prompt agreement to provide a DNA sample was consistent with Mr. Harris's mantra during the interview with the ATF agents: "that's not me." In consenting, Mr. Harris didn't succumb; he resisted. His ready agreement to provide a DNA sample was simply a continuation of his resistance to their accusations that he started the fire inside Boost Mobile.

Which brings us to a fact that entirely debunks Mr. Harris' claim that he consented to the buccal swab only because he was in unbearable pain. A few minutes after consenting to the buccal swab, Mr. Harris *refused* to consent to a polygraph examination when asked by one of the agents if he would take one. Showing that he was thinking clearly, Mr. Harris explained his refusal to take a polygraph by voicing concern about how the results could be used in court; he persisted in his refusal when the agent told him that the results would likely be inadmissible. What is important in this exchange is not whether Mr. Harris had a good reason to refuse a polygraph but rather that he was able to refuse a polygraph a few minutes after being coerced into agreeing to provide DNA evidence. His motion offers no explanation at all, much less a plausible one, as to why he was able to muster the will not to consent to a polygraph when he could not do so in the face of a request for a DNA sample.

The coercion claim also suffers because Mr. Harris points to no evidence that the police officers or the ATF agents knew anything at all about the rod in his leg or the effect of cold temperatures on it. Although Mr. Harris did complain about being cold during the ATF interview,[7]

---

[7] The video of the morning session also shows that Mr. Harris pulled his arms from his shirt sleeves and kept them pressed against his torso in a manner that suggests that he was trying to warm himself. This does not establish that the room was unreasonably cold, however; when his interview by ATF agents began, he had not been in the interview since 1:15 p.m.—almost eight hours earlier; when he signed the consent form he had only been in the room for only about half

8

he did not do so until after he had consented to the buccal swab search. Further, at no point during either interview did Mr. Harris complain of pain at all, much less that he was experiencing unbearable pain because the cold interview room was aggravating a metal rod in his leg. Mr. Harris was interviewed just after he returned from the hospital—where, records reflect, he did complain of hip pain but received no pain relief medication[8]—but he did not complain of pain to the agents and was not visibly experiencing pain or discomfort. There is, then, no basis to conclude that the agents were attempting to coerce Mr. Harris's consent by exploiting his pain.

The video of the interviews with Mr. Harris, coupled with the police reports and hospital records,[9] also demonstrate that Mr. Harris's claim that "he was interrogated for approximately nineteen (19) hours" is a gross mischaracterization. Mr. Harris was, to be sure, in *custody* for about 19 hours (his car was stopped at about 5:10 a.m. and he was released at about midnight), but he was *questioned* for only a small fraction of that period. Questioning by the police detective began at about 6:15 a.m. and effectively ended by about 8:00 a.m. (Mr. Harris remained in the interview room until about 1:15 p.m. but was subject only to a couple of booking questions). He was then moved to the lockup, where he spent the balance of the afternoon; he was not questioned there. At some point, Mr. Harris asked about his blood pressure medication and complained of hip pain and was taken to the hospital, arriving there at about 5:49 p.m. and being discharged at about 8:35 p.m. after receiving blood pressure medication. After returning to the police station, Mr. Harris was interviewed by the ATF agents for about one hour. Essentially, Mr. Harris was subject to two episodes of questioning, one lasting about one and a half hours, the other about one hour, punctuated by a substantial break and a visit, at Mr. Harris's request, to the hospital. This scenario bears no resemblance to a "19-hour interrogation" by law enforcement and falls well short of treatment that could reasonably be deemed to render Mr. Harris's consent to the buccal swab as involuntary.

This is particularly evident when one considers that Mr. Harris knew he could stop any questioning by law enforcement at any time. The videos establish (and Mr. Harris does not deny)

---

an hour. The Court also notes that during his interview with the ATF agents, the agents were wearing short sleeve shirts and did and said nothing to suggest that the room was chilly.

[8] That Harris complained of hip pain at the hospital undermines his coercion motion because it is undisputed that the hospital did not provide any pain relief medication to him. Thus, he either did not merit pain medication (which would make it unlikely that Harris was experiencing unbearable pain) or the medical staff refused to provide it despite being medically indicated (which would make it unlikely that having been taken to the hospital complaining of hip pain that Harris would make no complaint about the hospital's failure to provide medication or the continuing pain he was suffering) during the ATF interview that began as soon as Harris returned to the police station from the hospital.

[9] Mr. Harris disputes the authenticity of the medical records of his September 30 hospital visit because some of the information is out of date or inaccurate. ECF No. 94. These quibbles are neither persuasive nor material. The only relevance of the medical records to this motion is that they document the timing of the hospital visit, that he complained of not receiving his blood pressure medication and hip pain, and that he was given a dose of blood pressure medication but not pain medication. Mr. Harris has not disputed any of this information.

that he was twice advised of his *Miranda* rights and waived them. He does not—and cannot—claim that those waivers were the product of the coercive interrogation process. The first waiver came at the outset of the first interview, before Mr. Harris had spent any significant time in the purportedly frigid interview room. The second came just after Mr. Harris's two-hour visit to the hospital, and at the outset of the ATF interview—when he had not been subject to the cold interrogation room for more than seven hours.

In short, police had ample basis to arrest Mr. Harris for the Boost Mobile arson and it is clear that he voluntarily consented to provide a DNA sample. There is no basis, then, to suppress the evidence that Mr. Harris's DNA was found on implements of the arson.

### 2. Search of Residence and Car

Harris also contends that the evidence seized during the search of his residence—a black hat with gold accents that appeared to be the hat worn by Mr. Harris in the Boost Mobile store and by the arsonist—was the fruit of his unlawful arrest, but that claim fails again for the same reason: the arrest was lawful. He also maintains that his wife's consent to the search was coerced by the agents' threat to take her mother's car if she did not consent to a search of the apartment. Mr. Harris was not present during the search and interview, however, and has offered no evidence to support his claim of coercion. Most notably, he has not provided an affidavit from his wife supporting his claim. Moreover, review of the audio recording of the interview belies Mr. Harris's claim that his wife's consent was coerced. When the agents arrived, they explained that they were conducting an investigation of her husband. She was extremely friendly and helpful to the agents and answered their questions readily; it is impossible to characterize this episode as nonconsensual. She showed them her well-stocked bar. She showed them her aquarium. She told the agents she would leave the downstairs door open so they could come back in when they were finished with the car. She volunteered that Harris left the house each morning about 5:00 a.m. and showed the agents the log of his departures maintained by the software application on her phone. With respect to the black cap, agents found the hat when Mrs. Harris, prompted only by questions about what sort of clothing Mr. Harris wore to work, opened Mr. Harris's closet to them. Against this evidence of consent, Mr. Harris's claim that the agents coerced his wife to permit the search is baseless.

The claim that the agents coerced consent to allow the search of her mother's car fails for the same reason; the audio recording rebuts any claim of coercion. Mrs. Harris declined even to be present while the agents searched the car, preferring to remain in the house. Mr. Harris also argues that his wife had no authority to consent to the search of her mother's car, but that is wrong; as the government explains, in allowing Ms. Harris to use her car, her mother assumed "the risk that [she] might permit access to others, including government agents." *United States v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000). Mr. Harris, moreover, has not established his standing to assert his own, or his mother-in-law's, right to privacy with respect to her automobile. In any event, Mr. Harris's motion to suppress any evidence seized during the search of the car is moot, as no evidence was seized from the car.

### C. Motion to Dismiss

Mr. Harris also seeks dismissal of the indictment based on an alleged *Brady* violation. Although not entirely clear from the motion, Mr. Harris contends that the Boost Mobile owner

turned over to law enforcement a video recording from a week before the fire of the statement of a customer in the store that "we should burn the store down" in response to an outage in Boost Mobile's cellular service and that the video has not been provided to him.

To establish a *Brady* violation, a defendant must show that information is "(1) favorable, (2) suppressed, and (3) material to the defense." *United States v. King*, 910 F.3d 320, 326 (7th Cir. 2018). Even assuming that a statement by another person advocating burning the store down would be favorable and material to Mr. Harris's defense, his motion to dismiss the indictment based on *Brady* misses the mark because Mr. Harris has not shown that the government suppressed that information. To the contrary, the information about the "burn the store down" threat has not been suppressed from Mr. Harris; he has known of it from early on in the case. *See, e.g.*, Defendant's pro se "motion to compel discovery and/or subpoena," ECF No. 52, at 6 ¶ 3 (seeking production of video of the "burn down the store" statement). As such, his reliance on *Brady* is misplaced— for at least two reasons. First, *Brady* is a disclosure requirement rather than a discovery requirement. *See, e.g., United States v. Dixon*, 790 F.3d 758, 759 (7th Cir. 2015); *Evans v. Cir. Ct. of Cook Cty., Ill.*, 569 F.3d 665, 667 (7th Cir. 2009). The government long ago disclosed to Mr. Harris the allegedly exculpatory fact that a week or so before the arson, a disgruntled customer had threatened to burn down the Boost Mobile store, and "[b]ecause this potentially exculpatory fact was disclosed in time to be used at trial, *Brady* has been satisfied." *Dixon*, 790 F.3d at 759.[10]

Second and relatedly, *Brady* does not apply to evidence not in the possession of the government that a defendant could have procured for himself with the exercise of reasonable diligence. *United States v. Tadros*, 310 F.3d 999, 1005 (7th Cir. 2002). And to the extent that his motion is predicated on a claim that the government has a video recording of the "burn down the store" remark, it fails because he has not proffered any evidence to contradict the government's representations that it has no video recording of that statement and has produced to the defense all of the video recordings it has obtained.

Mr. Harris apparently bases this claim on the law enforcement report attached as an exhibit to his motion. Review of that report, however, provides only a tenuous thread to support Mr. Harris's claim that the store owner and/or manager gave or showed a video of a customer threatening to burn the store down to investigators. To begin, the only videos expressly discussed in the report are videos of the fire from the Boost Mobile store and from another store across the street. The report states that the store owner gave investigators access to the store's video system and gave them permission "to make copies of the video." The report reflects that the investigators "created copies of the footage from prior to and during the fire." While it is literally possible that the reference to footage "from prior to" the fire could refer to video a week before the fire, the Boost Mobile owner has told both the government and the defendant's prior counsel that it has no video recording of the "burn down the store" comment.[11] The reference to video recorded "prior

---

[10] To the extent that Mr. Harris contends that the government had a duty to present this evidence to the grand jury, he is in error. Courts may not dismiss an indictment for failure to present exculpatory evidence to the grand jury. *United States v. Williams*, 504 U.S. 36 (1992).

[11] The government represents that an agent contacted the Boost Mobile owner who confirmed that he did not have any video of the "burn down the store" threat. Govt. Response,

11

to" the fire more plausibly refers to events occurring during the evening and early morning hours prior to the arson, which corresponds to the video recordings that have been obtained from the Boost Mobile store: Harris's visit during the evening of September 9 and footage from about a half hour before the arson to just after the fire began. Mr. Harris's contention that the investigators reviewed, and copied, footage of someone threatening to burn the store down a week or so before the fire—and that he is now being denied access to that video, is both unsupported and implausible conjecture.

Further, to the extent that Mr. Harris is alleging that the government had a duty to obtain and copy video of the "burn down the store" threat, he is again mistaken. In *Tadros*, the Seventh Circuit rejected a similar *Brady* claim by a defendant who asserted that the government had failed to turn over audiotapes of the defendant recorded by an insurance company where the government did not have possession of the tapes before trial but had disclosed the existence of the recordings to the defendant during pretrial discovery. *Id*. The Seventh Circuit observed that it "has held many times that *Brady* does not require the government to gather information or conduct an investigation on the defendant's behalf." *See also Polzin v. Mutter*, 503 F. App'x 474, 476 (7th Cir. 2013) (citing cases for the same proposition).

Mr. Harris also argues that the Due Process clause "imposes a burden on the prosecutor to learn of any favorable evidence known to others acting on the government's behalf," Motion, ECF No. 79, at (8), but the cases he cites stand only for the proposition that prosecutors have a duty to disclose evidence in the possession of law enforcement personnel assisting in the investigation and prosecution of the defendant, not that *Brady* requires prosecutors to obtain and produce evidence from third parties over which they have no control.

Mr. Harris's motion under *Brady* therefore misses the mark: the government timely disclosed the information about the comment to the defense; there is nothing but unsupported speculation to suggest that any video recording of that statement exists; and even if there were such a video recording, the government has no duty to obtain it for the defendant. Accordingly, the defendant's motion to dismiss the indictment is denied.

Dated: April 25, 2022

/s/ John J. Tharp, Jr.
John J. Tharp, Jr.
United States District Judge

---

ECF No. 84, at 10. Further, the Court authorized Mr. Harris's prior counsel to issue trial subpoenas for any such video, but no such video has been produced.